CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
JUN 28 2005
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ROSS EICHNER,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES POSTAL SERVICE;<br>NATIONAL POSTAL MAILHANDLERS UNION,<br><br>*Defendants.* | CIVIL ACTION NO. 3:03-CV-00100<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on a Motions for Summary Judgment by each of the defendants. Defendant United States Postal Service ("USPS") filed its motion on November 9, 2004. Defendant National Postal Mail Handler's Union ("NPMHU") filed its motion on December 3, 2004. After a brief delay in which the discovery deadline was extended, this Court heard oral argument on the motions on March 21, 2005. For the reasons that follow, on June 15, 2005, the Court granted the motions and dismissed this case from the docket.

I.

*Pro se* Plaintiff Ross Eichner ("Eichner") was employed by the USPS as a mail handler at the main Charlottesville post office and the Charlottesville Processing and Distribution facility from September 1998 until his termination in January 2003. During the final eight years of his

employment with USPS, Eichner on several occasions was subject to discipline for his irregular attendance at work. For example, in 1995, Eichner received a letter of warning regarding his attendance. Subsequently, in 1999, he received a seven-day suspension for his attendance. In 2000, he received a fourteen-day suspension for the same reason, regarding which he was told:

> Your continued failure to meet your job requirements cannot be tolerated .... I must warn you, that future deficiencies will result in more sever disciplinary action being taken against you. Such action may include suspensions, reduction in grade and/or pay or removal from the Postal Service.

Despite such warnings, Eichner's attendance problems continued. In fact, they worsened. In 2002, Eichner was absent from work for nine weeks, from May 21 to July 24, without providing USPS with requested medical documentation. Accordingly, USPS sent Eichner a notice of proposed removal, the first step in terminating an employee from his position for poor performance. In doing so, USPS noted:

> Your poor attendance record does not aid the Postal Service in its mission ... [and] does not aid in the efficiency of the service. Such absences imposes [sic] burdens on other employees and destroys [sic] the morale of those who do meet their attendance obligations. Your ability to decide how long and when you absent yourself without advance approval and proper substantiation or documentation produces chaos in our workplace.

After Eichner received this notice, NPMHU grieved the proposed removal. Ultimately, USPS settled the grievance by allowing Eichner to keep his job and instead converting the proposed removal into a fourteen-day suspension. Nevertheless, the event put Eichner on notice that his unexcused absences from work would not be tolerated further.

In addition to Eichner's attendance problems, Eichner also was subjected to discipline on several occasions for disrespecting or failing to obey the orders of his supervisors. In 1996,

Eichner was given a seven-day suspension for, among other things, disobeying three direct orders from his supervisor to return to work after Eichner had left the building claiming that the fire alarm was not functional, despite his supervisor's assurance to the contrary. This discipline, however, apparently was not sufficient to impress upon Eichner the importance of obeying orders from a superior. Later that year, USPS once again sent Eichner a notice of proposed removal, this time for once again failing to obey his supervisor.

Thus, by the time of the employment action at issue in this case, Eichner had been disciplined on several prior occasions. More than once, USPS's discipline of Eichner had risen to the level of a fourteen-day suspension, and more than once, USPS had proposed to terminate Eichner from his position. Throughout this discipline, USPS had provided Eichner with notice that it was unwilling to tolerate his twin problems of absenteeism and disrespect for supervisors.

These twin problems finally came to a head at the end of 2002. During a dispute between Eichner and his supervisor regarding insufficient staffing at his station on December 7, 2002, Eichner's supervisor told him that he had to return to his station and continue working. Eichner became angry to the point that he "thought he was going to lose control," so he left the plant and did not call or return to work until December 9, 2003. Eicher justified this decision by asserting that it is acceptable for an employee to leave the building if he has a problem with another employee, since members of the USPS "Threat Assessment Team" had told him during training that he should remove himself from any work situation that he feared could become volatile. As a result of this final incident, on December 24, 2002, USPS issued to Eichner another Notice of Proposed Removal for "unsatisfactory attendance." It indicated that Eichner had been absent without leave from December 7 through December 9, 2002, and also listed

3

Eichner's other unscheduled absences in the previous six weeks, which were extensive. On January 6, 2003, Eichner responded by a faxed letter, blaming the December 7, 2002 incident on his supervisor. On January 8, 2003, USPS issued a final Letter of Decision terminating Eichner from his position.

Subsequent to this termination, Eichner initiated a grievance procedure pursuant to Article 15 of the USPS-NPMHU collective bargaining agreement. Due to the Court's disposition of the matter, a recitation of the facts concerning this grievance procedure is unnecessary. It is sufficient to note that NPMHU assisted Eichner through this multi-step process at every step in which he requested its assistance and, after the designated proceedings, USPS at each step affirmed the decision to terminate Eichner. Ultimately, NPHMU appealed USPS's decision to arbitration on April 13, 2003.

An arbitration was conducted on July 29, 2003 before Arbitrator Phillip W. Parkinson. After a hearing in which both USPS and NPMHU presented significant arguments, both substantive and procedural, Arbitrator Parkinson ultimately ruled in favor of USPS, concluding that USPS had just cause to terminate Eichner's employment. He acknowledged Eichner's testimony regarding the circumstances surrounding his decision to leave work on December 7, 2002, but nevertheless determined that Eichner was clearly absent without leave. He further rejected Eichner's claim that he did not understand the exact nature of his obligations, finding it "devoid of all credibility" and noting the multiple direct warnings that Eichner had received in the past. The arbitrator also acknowledged Eichner's extensive absences from work during the six-week period from October 20 to December 8, 2002, and USPS's significant efforts to correct Eichner's unacceptable attendance record, which included three suspensions and a referral to the

Employee Assistnace Program. Accordingly, he determined that USPS had just cause to terminate Eichner's employment.

Arbitrator Parkinson did rule in Eichner's favor on two issues: (1) Eichner's grievance appeal was not barred for being untimely, as USPS had argued, and (2) Eichner may have been entitled to certain back pay under the contract. In light of this second finding, Arbitrator Parkinson explained that upon review of Eichner's attendance records, the parties would be able to determine if Eichner was owed additional compensation.

## II.

Eichner's complaint is styled as a "Motion to Vacate" and purports to seek vacation under the Federal Arbitration Act ("FAA") of Arbitrator Parkinson's award upholding Eicher's termination by USPS. It is not appropriate for Eichner to seek relief under this statute, however, for a variety of reasons, the most fundamental being that the FAA simply does not apply to arbitration under collective bargaining agreements. The Fourth Circuit, like most other federal courts of appeals, has explicitly recognized that "the FAA does not apply to disputes stemming from collective bargaining agreements." *Domino Sugar Corp. v. Sugar Workers Local 392*, 10 F.3d 1064, 1067 (4th Cir. 1993) (citations omitted).

Nevertheless, due to Eichner's *pro se* status, it is appropriate to grant Eichner latitude and address focus not upon his formal language, but rather the essential nature of his complaint and desired relief. Taken in this light, Defendants correctly point out that Eichner's claim is a prototypical "hybrid § 301/duty of fair representation" claim. It is a combination claim against USPS for violating the collective bargaining agreement under § 301 of the Labor Management

5

Relations Act ("LMRA") and claim against NPMHU for breach of its duty of fair representation under § 9 of the National Labor Relations Act ("NLRA"). This alternative reading of Eichner's complaint successfully states a claim against USPS and NPHMU.

A "hybrid § 301/duty of fair representation" ultimately is composed of two separate, but interdependent, claims. The duty of fair representation ("DFR") in federal labor law is a duty implicit to NLRA § 9, which provides for a union's role as the exclusive bargaining representative of all employees. According to the United States Supreme Court, "as the exclusive bargaining representative of the employees in [the plaintiff's] bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with [the employer], . . . and in its enforcement of the resulting collective bargaining agreement." *Vaca v. Snipes*, 386 U.S. 171, 177 (1967) (citations omitted). DFR claims arising in the context of the union's administration of the collective bargaining agreement, such as Eichner's claim, generally concern the union's action in adjudicating an allegedly improper disciplinary action by the employer. Such improper disciplinary actions, because they are a violation of the collective bargaining agreement, are brought pursuant to LMRA § 301. *DelCostello v. Teamsters*, 462 U.S. 151, 164–65 (1983).

As Defendants explain, these two claims are "inextricably interdependent." *Id. at 164* (citation omitted). First, the employee would have no claim against the union were it not for the employer's alleged breach of the collective bargaining agreement. Second, because the nature of grievance and arbitration procedures in collective bargaining agreements otherwise would preclude an employee's recourse to the courts for a collective bargaining agreement violation, the necessary predicate for an employee's individual § 301 suit against the employer is that the union

6

breached its DFR in handling the grievance. *Id.* at 164–65; *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990).

Because of the interdependent nature of these claims, the Supreme Court has held that "[t]o prevail against either the company or the Union, employee-plaintiffs must not only show that their discharge was contrary to the contract but also carry the burden of demonstrating a breach of duty by the Union." *DelCostello*, 462, U.S. at 165 (citations omitted). Therefore, for Eichner to prevail on his claim, he must demonstrate both that the union violated its DFR by not devoting adequate resources to his grievance and that the arbitrator erred in ruling that USPS had just cause for terminating him for disciplinary problems and excessive absenteeism.

The Court need not consider both claims, because it is wholeheartedly satisfied that arbitrator did not err in his ruling. This Court's review of a labor arbitrator's award is "extremely narrow," *Am. Postal Workers Union v. USPS*, 52 F.3d 359, 361 (D.C. Cir. 1995), and "only the narrowest circumstances will justify setting the award aside." *Madison Hotel v. Hotel & Restaurant Employees, Local 25*, 144 F.3d 855, 858–59 (D.C. Cir. 1998) (en banc). The reason for this deference to the arbitrator's decision is simple: "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960). Therefore, in reviewing arbitration awards, courts look at whether the award "draws its essence" from the contract. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987); *Enterprise Wheel*, 363 U.S. at 597. So long as the arbitrator at least arguably bases the award on the contract, a court may not vacate it, even if convinced that the arbitrator committed serious

7

error. *Major League Baseball Player's Ass'n v. Garvey*, 532 U.S. 504, 509 (2001); *Misco*, 484 U.S. at 38.

In the instant case, Plaintiff has not explained, nor can he, why the circumstances here justify the drastic act of overturning the arbitration award. Arbitrator Parkinson's award unquestionably "draws its essence" from the collective bargaining agreement. Indeed, the arbitrator applied relevant provisions of the collective bargaining agreement in coming to his decision. Accordingly, it is not proper for this Court to vacate the award.

Moreover, even if the standard of review were not so deferential, the overwhelming evidence makes it abundantly clear that the arbitrator's award was entirely proper. By any measure, Eichner was a poor employee. Over the course of his career with USPS, he demonstrated a prevailing absenteeism and a disrespect for authority that made it difficult for USPS to rely upon his work. Eichner received three suspensions for these problems, and on at least two occasions, USPS actually proposed terminating him from his position. With at least two of his suspensions, USPS provided Eichner with express notice that his behavior was unacceptable. For this reason, Eichner's claim that "precedent" existed for his decision on December 7, 2002 to leave work unexcused for two days after a fight with his superior simply defies belief. Whatever advice USPS may have given him in training about removing himself from situations that might become volatile, it did not include a recommendation that he angrily abandon his post at work with no explanation for two days.

Further, contrary to Eichner's claims, the arbitrator did not ignore Eichner's mitigating factors. As Eichner's own brief admits, the arbitrator acknowledged that Eichner's circumstances involved "a marital abandonment, a house in foreclosure, and a sudden bout of

8

substance abuse." Rather, the arbitrator essentially concluded that these mitigating factors were outweighed by Eichner's long record of discipline problems, which indicated that Eichner's performance could not be improved by a further reprieve. Although Eichner might disagree with these conclusions, it is clear that the arbitrator gave fair consideration to all evidence at the hearing. For this reason, there is no evidence to conclude that the arbitrator was acting from improper motives or bias toward USPS.

Finally, Eichner's response to the motions for summary judgment in no way rebuts the conclusion that the arbitrator's award in favor of USPS was appropriate. Eichner claims that the award was incomplete because it did not adequately address the issue of his back pay, and thus may be vacated. Although it is true that Arbitrator Parkinson did not determine the specific amount of back pay to which Eichner might be entitled under the contract, this fact does not make his award incomplete. To the contrary, the award is in fact complete because it settles the fundamental contractual dispute concerning Eichner's back pay. Arbitrator Parkinson stated that "[i]nasmuch as this time frame [between Eichner's proposed removal and his actual termination] comprised less than thirty days, Mr. Eicher is contractually entitled to additional days on the clock," and that "[u]pon review of Mr. Eichner's attendence records, the parties will be able to determine if additional compensation for the full thirty-day period is owed to Mr. Eicher." For this reason, it is not appropriate for this Court to vacate the ruling on grounds of incompleteness. Eichner offers no other basis in his response for overturning the arbitrator's ruling.

For these reasons, it is not proper to overturn the arbitrator's decision that USPS had just cause to terminate Eichner from his position. Because Eichner cannot satisfy this essential element in his hybrid "§ 301/duty of fair representation" claim against USPS and NPMHU, he

9

cannot recover against either of Defendants on either claim. Accordingly, Defendants' motions for summary judgment have been granted as described in the Court's Order of June 15, 2005.

The Clerk is hereby directed to send a copy of this Order to all Counsel of record.

ENTERED: _____
U.S. District Judge

6/28/05
Date

10